IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:20-CR-23-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| MICHAEL HANS MEINTZSCHEL, | ) | |
| | ) | |
| Defendants. | ) | |

This matter came before the court on April 16, 2021, for hearing on defendant's appeal (DE 36) of magistrate judge order (DE 34). The court memorializes herein its reasons for affirming that part of the magistrate judge order regarding mental health records of the alleged victim. At hearing, the court also set aside part of the magistrate judge order pertaining to communications on an iPad tablet used by the alleged victim. The court ordered the government to take into its possession the iPad tablet and to file a proposed consent order for forensic analysis of the same. The government now moves for reconsideration (DE 55)[1] of the court's order requiring a forensic analysis. For the following reasons, the court grants in part the motion for reconsideration and now allows defendant's motion seeking issuance of a subpoena for information contained within the iPad tablet. (DE 27, 46). The court orders a forensic analysis of the iPad tablet in accordance with the conditions enumerated below.

_____

[1] The court DIRECTS the clerk to amend docket entry 55 to reflect that it includes a motion for reconsideration of a portion of the court's Aril 16, 2021, oral order.

# BACKGROUND

Indictment filed May 13, 2020, charges defendant with enticement of a minor, sexual abuse of a minor, and abusive sexual contact with a child, taking place on November 25, 2019, at Cape Hatteras National Seashore, an area within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 2422, 2243, and 2244.

According to the government, the facts underlying the charges are summarized as follows:

> On or about November 25, 2019, the victim (A.B.) was thirteen years old. A.B. spent the Thanksgiving holiday with her grandparents and their friends at the Cape Hatteras National Seashore. Defendant, a close friend of A.B.'s grandfather, joined their family on the trip.[2]
>
> That morning, Defendant invited A.B. to drive with him and go for a walk on the beach. A.B. agreed. During this trip, Defendant questioned A.B. about her sexual activity, including relations she had with boys her age. Defendant repeatedly made advances toward A.B., asking whether he could touch her leg and stomach. Ultimately, Defendant digitally penetrated A.B.
>
> When A.B. returned to the beach house with Defendant, she texted her boyfriend about what had happened. She remained away from the rest of the occupants of the house, staying in the room she was sharing with her family. She ultimately told her grandfather what happened. The family left Cape Hatteras the next day.

(Gov. Resp. (DE 40) at 2). Defendant was arrested on June 4, 2020, and released with conditions following initial appearance in Charlottesville, Virginia, on June 5, 2020. Upon initial appearance in this court, on June 24, 2020, defendant has continued on existing conditions of release.

Defendant filed two motions subject of the instant appeal on November 3, 2020. In his motion to produce mental health records (DE 27), defendant seeks:

> an order directing any and all persons and agencies having or maintaining medical, psychological, social, and school records[3] for the child, A.B., the alleged victim

---

[2] According to defendant, he is "a 57-year-old man who has raised two daughters and worked with youth most of his adult life." (Def's Appeal (DE 36) at 2).

[3] Defendant withdrew his request for school records at hearing on February 9, 2021, and again confirmed withdrawal of this request at hearing on April 16, 2021.

referenced in the Bill of Indictment, to produce the same for inspection and copying by the counsel for the accused.

(DE 27 at 1).  In the alternative, defendant seeks to have the court:

Issue subpoenas duces tecum to the Dare County Sheriff's Department; the Foothills Child Advocacy Center; . . . and upon any other person or agency with custody and/or possession and/or control of records of the type identified in this motion, requiring such agencies and persons to produce such records for an in camera inspection by this Court[.]

(Id. at 3).  In addition, in his motion for access to accuser's social media, defendant seeks "access to the Accuser's social media files, her i-Phone/tablet and any related cloud back-up, and/or computer back-up data."  (DE 28 at 1, 5).

In order entered December 14, 2020, the magistrate judge denied these motions.[4] Defendant filed the instant appeal on January 4, 2021, asserting a combination of arguments in support of both motions.  (See DE 36 at 1-5). At hearing on February 9, 2021, the court directed defendant to supplement both of the motions that are the subject of the appeal, and to provide further details about specific items in discovery defendant relies upon to seek access to mental health records and social media records.   The court also set trial to commence July 12, 2021.

Defendant filed a sealed supplemental brief on February 15, 2021, relying upon transcripts of investigator interviews and screenshot images of messages allegedly obtained from the iPad/tablet.  (DE 46).  In his supplemental brief, defendant requests "that this Court issue subpoenas for such records," comprising mental health records and related information about the

---

[4]    The magistrate judge also granted in part defendant's motion for exculpatory evidence (DE 30), not subject of the instant appeal, in which defendant sought to order the government to provide to defense counsel "any materials in the possession of the Government and law enforcement agencies which are favorable to defendant," no later than one month prior to the start of trial.  (DE 30 at 1, 3).  The magistrate judge directed the government to produce the same on ongoing basis, and this court affirmed that decision on February 9, 2021.  The magistrate judge also granted in part defendant's motion to sequester, not subject of the instant appeal.  At hearing on February 9, 2021, the court specified that the government designated special agent Curtis Kennedy as its case agent, who may remain in the courtroom throughout trial. The accuser and her mother shall not attend opening statements with consent of the government; however, at all other times they shall remain if they so choose.  (Order (Feb. 9, 2021) (DE 45)).

victim, as well as social media information, including texts made through the alleged victim's iPad tablet. (DE 46 at 6). The government filed a response on February 23, 2021. (DE 51).

At hearing held April 16, 2021,[5] upon inquiry by the court regarding categories of items sought by defendant, defendant confirmed that one category is "communications on" the iPad tablet, and that the relevant time period is between November 25, 2019, and December 17, 2019.[6] With respect to another category, defendant suggested that there was evidence that the alleged victim had issues with "depression" and had seen a therapist after the events subject of the instant indictment. Defendant reiterated that he is seeking communications about the events in question as portrayed to the alleged victim's therapist, including "how she framed this event to her therapist" and as may be memorialized in any "therapist notes," for the same time period. Upon further inquiry by the court, defendant confirmed he does not have the name of a particular therapist. The government also stated it has not been apprised of the name of any therapist, nor therapist notes, nor any diagnoses, but only what is referenced in the transcript of investigator interviews. At that point, the court affirmed that part of the magistrate judge order regarding mental health records of the alleged victim, noting its reasoning would be memorialized in an opinion to follow.

By contrast, the court noted that the iPad tablet presents different circumstances, and it set aside the magistrate judge's decision with respect to the iPad tablet for the time period sought. The court stated that it was going to "allow a process to go forward in that regard," with benefit of input from the parties. The government noted its understanding that the iPad tablet "belongs to the mother" of the alleged victim, and that the alleged victim was "only allowed to possess it when

[5]     At both the hearing held February 9, 2021, and April 16, 2021, the government was represented by Aakash Singh, and defendant was represented by Myron T. Hill, Jr., and Ernest L. Conner, Jr.

[6]     In quoting statements made at hearing on April 16, 2021, where a transcript has not been produced, the court refers to its own notes, solely for purposes of background for this memorandum opinion and order.

her mother would give it to her." The court stated at the hearing that the mother of the alleged victim is "going to have to turn over the device." The government raised as an issue that this would "open the parties up to seeing information that has nothing to do with the case and is entirely a privacy infringement of the mother."

In response to the government's concerns, the court noted that the court and the parties will "have to take that into consideration," and that there would need to be an "objective technical forensic examination overseen by the government of the device." The court solicited help from the government in crafting "some protocols that take into consideration that concern," and the court noted the need to "collaborate on" getting a report in the form of a proposed plan from the government.[7]

In determining a schedule for delivery and evaluation of the iPad tablet, the court confirmed with the government that the device was preserved. The government stated its understanding that when the parents were interviewed by agents, the agents "made clear to them that they would need to maintain all this stuff for evidentiary purposes." The court raised an issue with respect to how much of the communications were "in the cloud" versus "dedicated to the device," and the government expressed it did not know what else was on the device apart from the messages already produced by the government. Counsel for defendant noted that "if something was deleted" from the iPad tablet, forensic experts in his experience have been able to "find out what's been deleted from the tablet" without need for recourse to the "cloud."

The court then ordered the government to recover the iPad tablet and any access password from the parents of the alleged victim by April 19, 2021. The court noted, however, that until

---

[7] In the course of argument at hearing, defendant requested that the court "seal for the record" the contents of the iPad tablet, not for defendant's use, but solely for "appellate purposes." The court took note of this request for consideration but did not at that time incorporate this request into any ruling by the court.

procedures are developed and agreed to by the court, there "will be no access made of the device." The court then ordered the government to "confer with the defendant and attempt to obtain some agreement that the objective forensic evaluation" is acceptable to defendant, and to file a "proposed plan of action" or "consent order" by April 23, 2021.[8] The court directed that "there needs to be some general descriptions that assure the court that the mother's confidences are being protected." The court noted the need for any consent order to limit the categories sought to communications via text, email, or through the "Steam" app by the alleged victim.

The government filed response to the court's order on April 23, 2021, including the instant motion for reconsideration. The government states that its case agent, Curtis Kennedy ("Kennedy"), "took custody of the iPad" and mailed it to special agent Kyler Carpenter ("Carpenter"), a digital forensic technician with the National Park Service. (DE 55 at 3). The government notes that Carpenter has "advised the government that he cannot provide this Court with a preview or excerpt of the iPad's contents," and that he "must make a complete copy – known as an extraction – of the iPad's contents, which this court could then review." (Id. at 3). The government objects to doing so in this instance, and requests that the court reconsider its order compelling a forensic evaluation the iPad tablet, as discussed in further detail in the analysis herein.

Defendant filed an objection to the government's response on April 28, 2021, urging the court to order the government to comply with the court's April 16, 2021, order. The government filed a supplement to its response on May 4, 2021.

---

[8]     The court noted anticipated additional steps following filing of proposed plan, including a deadline for completion of the forensic evaluation, for making a report to the court of the same, and for delivery of material under seal in camera, with filing of notice by the government confirming the same.

**COURT'S DISCUSSION**

In the following discussion, the court first memorializes its reasons for affirming that part of defendant's appeal seeking mental health records and related information about the alleged victim. Then, the court turns to that part of the appeal pertaining to communications on the iPad tablet.

A.    Mental Health Records and Related Information

In the course of this case, defendant has requested on multiple grounds a variety of mental health records and related information about the victim. Although it appears that defendant most recently narrowed his requests to the issuance of a subpoenas for therapist notes and similar records, the court addresses herein all grounds and categories of records sought by defendant for the sake of completeness.

1.    Request for Order Directing the Government to Obtain Records

Defendant argues that the court should order the government to obtain mental health information related to the alleged victim, from her family, from state and local agencies, and from others. Relying upon Pennsylvania v. Ritchie, 480 U.S. 39 (1987) and Love v. Johnson, 57 F.3d 1305 (4th Cir. 1995), and general principles under Brady v. Maryland, 373 U.S. 83 (1963), as authority, defendant argues the material should be produced directly to defendant or to the court for in camera review. Defendant's reliance on Ritchie, Love, and Brady, however, is misplaced under the circumstances of this case.

"Brady, which rests upon due process considerations, . . . provides the minimum amount of pretrial discovery granted in criminal cases." United States v. Caro, 597 F.3d 608, 620 (4th Cir. 2010). Brady "requires the government to disclose 'evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment.'" Id. (quoting Brady, 373 U.S. at

87).  To require disclosure under <u>Brady</u>, evidence must be: "(1) favorable to the defendant (either because it [is] exculpatory or impeaching), (2) material to the defense . . . and (3) . . . within the prosecution's possession."  <u>United States v. Young</u>, 916 F.3d 368, 383 (4th Cir. 2019).  Rule 16 more broadly requires the government to provide to defendant access to categories of items "material to preparing the defense," with a similar requirement that the items be "within the government's possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E).

<u>Ritchie</u> and <u>Love</u> applied <u>Brady</u> in the context of medical and psychological records to which a state prosecutor had access, requiring in camera inspection.  In <u>Ritchie</u>, the Supreme Court held that "relevant information [must] be disclosed when a court of competent jurisdiction determines that the information is 'material' to the defense of the accused," in the context of a state court prosecution where communications between sexual assault counselors and a victim was in possession of a state agency, authorized by state statute to be disclosed if directed by court order.  <u>Ritchie</u>, 480 U.S. 39, 57–58 (1987).  There, the court determined that the defendant was "entitled to have the [state agency] file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial."  <u>Id.</u> at 58.

In <u>Love</u>, the Fourth Circuit similarly held that "[b]ecause [the defendant] made a plausible showing that sufficiently identified state agency records might contain evidence that was material and favorable to his defense, the state court's refusal to inspect the identified records in camera and to seal any not disclosed for appellate review violated Love's constitutional right to such a procedure." 57 F.3d at 1307.  In so holding, the court noted that "[t]he '<u>Brady</u>' right, as recognized and implemented in <u>Ritchie</u>, is not limited to information in the actual possession of the prosecutor and certainly <u>extends to any in the possession of state agencies subject to judicial control</u>."  <u>Id.</u> at 1314 (emphasis added).  "The constitutional obligation imposed by <u>Ritchie</u> is one <u>imposed upon</u>

the state, which means upon the judge as well as all other state actors involved in the process of insuring in camera inspection of evidence sufficiently shown" to be relevant. Id. at 1315 (emphasis added).

The Fourth Circuit has since recognized that the in camera procedure applied in Love may apply where "the government may possess potential Brady material that it deems privileged or that is otherwise confidential." United States v. Abdallah, 911 F.3d 201, 217–18 (4th Cir. 2018) (emphasis added). In such cases, "[b]ecause the defendant does not have access to the confidential material, the defendant cannot possibly know, but may only suspect, that particular information exists which meets Brady's requirements." Id. (quoting Love, 57 F.3d at 1313). "In such cases, a defendant need only make some plausible showing that exculpatory material exists." Id. At that point, the defendant is "entitled, in order to secure the basic right, to have the information he has sufficiently identified submitted to the trial court for in camera inspection and a properly reviewable judicial determination made whether any portions meet the Brady requirements for compulsory disclosure." Id. (quoting Love, 57 F.3d at 1313). In sum, neither Ritchie nor Love alter the basic requirement under Brady that exculpatory evidence must be in the possession of the government.

Here, the government unequivocally asserts in response to defendant's motions that it "has never had any copies of the victim's medical records, which belong to the treatment providers, over whom the government has no control." (Resp. (DE 31) at 2). At bottom, "[t]he government has no knowledge or possession of any . . . exculpatory evidence," as requested by defendant. (Id. at 4). Accordingly, Brady does not require the court to compel the government to disclose mental health records or related information about the alleged victim.

Based on the foregoing law and facts, defendant's argument that <u>Ritchie</u> or <u>Love</u> provides a basis for the court to direct the government to obtain records directly from state agencies or treatment providers and provide it to the court is unavailing. <u>Ritchie</u> and <u>Love</u> extend disclosure obligations to a state prosecution in which a state prosecutor and state court have access to and authority to obtain records from a state agency, by virtue of a state statute. <u>Ritchie</u>, 480 U.S. at 57–58; <u>Love</u>, 57 F.3d at 1307, 1314-1315. The holding in <u>Love</u> expressly turns on the recognition of control and access by state court and prosecution over a state agency. <u>Id.</u> In the context of <u>Brady</u>, the Fourth Circuit has recognized no such obligation extending between state and federal spheres of government. <u>See</u> <u>Kasi v. Angelone</u>, 300 F.3d 487, 506 (4th Cir. 2002) ("[T]he state prosecutor has no more authority to demand that the FBI allow him access to its files so that he can conduct a <u>Brady</u> review than the state court has to compel the FBI to allow the state criminal defendant such access.").

Defendant argues on appeal that <u>Ritchie</u> entitles him at least to have the court conduct an in camera review of the requested materials. But, this argument puts the cart before the horse in two respects: first, the court and the government itself must possess or have access to the materials, which is not the case here with respect to mental health records; and, second, defendant must make some "plausible showing that exculpatory material exists." <u>Abdallah</u>, 911 F.3d at 218. In <u>Love</u>, for example, the court noted "the alleged victim's undisputed involvement with each agency." 57 F.3d at 1313. There is not such a plausible showing here.[9]

Defendant also suggests that the government has an affirmative obligation or duty under <u>Brady</u> "to seek the information" that defendant has specifically requested in discovery, citing

[9] Moreover, another court of appeals has drawn into question the continued viability of the holding in <u>Love</u>, because it appears "to contradict the Supreme Court's disapproval in <u>Jaffee</u> of the in camera review of psychiatric records." <u>Newton v. Kemna</u>, 354 F.3d 776, 784–85 (8th Cir. 2004) (citing <u>Jaffee v. Redmond</u>, 518 U.S. 1, 18 (1996)). The court discusses <u>Jaffe</u> in further detail in the analysis below.

United States v. Agurs, 427 U.S. 97 (1976). (Def's Appeal (DE 36) at 10). But, Agurs does not so hold. There, the court held that a prosecutor's "failure to tender [the victim's prior criminal] record to the defense did not deprive respondent of a fair trial" under Brady. Id. at 114. The court confirmed that "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial," thus focusing on what portions of the file in possession of the prosecution must be disclosed to a defendant under Brady. Id. at 104 (emphasis added).

Furthermore, the law does not otherwise impose such an extensive duty to investigate on the part of the government under Brady. See, e.g., United States v. Capers, 61 F.3d 1100, 1103 (4th Cir. 1995) (noting there is "no duty to disclose when government did not know about or possess non-disclosed information"); see also Kyles v. Whitley, 514 U.S. 419, 427–38 (1995) (noting prosecutor's duty to learn of, and disclose, exculpatory evidence "known to the others acting on the government's behalf in the case, including the police").

In sum, for the foregoing reasons, the court affirms the magistrate judge order denying those portions of defendant's motions (DE 27, 28), seeking direct disclosure by the government of mental health records or related information under Brady.

2.     Defendant's Request for Issuance of Subpoenas

In the alternative, defendant requests to have the court "[i]ssue subpoenas duces tecum" for mental health and related records of the alleged victim. (DE 27 at 3). He also suggests that the court should issue a subpoena to the alleged victim's parents and others to obtain other communications referencing the alleged victim lying or her sexual activities. (See DE 36 at 5; DE 46 at 6).

Whether the court should allow issuance of a subpoena to obtain information about a victim, as proposed here, is governed by Rule 17, which provides that a subpoena "may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1). "A subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order." Fed. R. Crim. P. 17(c)(3). Further, "[b]efore entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object." Id. "[T]he court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2).

A party moving for a Rule 17 subpoena "must clear three hurdles: 1) relevancy; (2) admissibility; (3) specificity." United States v. Nixon, 418 U.S. 683, 700 (1974). In addition, "[c]ourts have recognized various ways in which a subpoena may be unreasonable or oppressive under Rule 17(c)," such as if the subpoena requests underlying material that is privileged, if the subpoena is "overly vague" or "excessively broad," or if the subpoena would "intrude[] gravely on significant interests outside of the scope of a recognized privilege." In re Grand Jury, John Doe No. G.J.2005-2, 478 F.3d 581, 585 (4th Cir. 2007).

A Rule 17(c) subpoena is not intended to provide a means of pretrial discovery." United States v. Richardson, 607 F.3d 357, 368 (4th Cir. 2010). "[T]he hope of obtaining favorable evidence does not justify the issuance of such a subpoena" and a movant fails to meet their burden when they can only speculate as to what the requested information would . . . show[]." United States v. Caro, 597 F.3d 608, 620 (4th Cir. 2010) (quotations omitted). A "lack of specificity" in a Rule 17 subpoena indicates that the criminal defendant "is merely fishing for evidence that might support his theory, as if he were in the discovery phase of a civil action." Richardson, 607 F.3d at

368. This is impermissible because "a Rule 17 subpoena <u>duces tecum</u> cannot substitute for the limited discovery otherwise permitted in criminal cases." <u>Id.</u> (quotation omitted).

In this case, with respect to mental health treatment records and related information, defendant suggests he is entitled to an order subpoenaing mental health treatment providers for therapists notes and other records of treatment. Defendant notes, for example, excerpts of a transcript of an interview between the alleged victim and a "forensic interviewer" in which the she references "a therapist." (Def's Br. (DE 46) at 1). Defendant also points to the alleged victim's "treatment for depression" and what defendant characterizes as "suicidal" references. (<u>Id.</u> at 2). Defendant further points to references in investigator interview excerpts to the alleged victim "lying," including references by the investigator about the alleged victim and her boyfriend "being sexually active." (<u>Id.</u>). The court addresses these subcategories of information in two parts, in turn, below.

        a.      Mental Health Treatment

Turning first to mental health treatment, defendant has not demonstrated that information about the victim's mental health treatment would be relevant and admissible at trial on the charged offenses. In <u>United States v. Ayala</u>, 601 F.3d 256 (4th Cir. 2010), the United States Court of Appeals for the Fourth Circuit upheld a "district court's decision not to allow [a defendant] to ask one girl [victim of rape] whether she was under the care of any counselor, psychotherapist, or psychiatrist." <u>Id.</u> at 273. The court reasoned: "We have previously cautioned that permitting a defendant to cross-examine an adverse witness on such matters tends to be 'unnecessarily demeaning' and will 'generally introduce into the case a collateral issue, leading to a large amount of testimony substantially extraneous to the essential facts and issues of the controversy being tried.'" <u>Id.</u> (quoting <u>United States v. Lopez</u>, 611 F.2d 44, 45 (4th Cir.1979)).

In Lopez, the Fourth Circuit further observed generally about evidence of mental health treatment: "[C]ourts have frequently exercised the power to prevent excursions during cross-examination into collateral matters of a purely personal nature having minor probative value." Lopez, 611 F.2d at 45. "Particularly true is this in those cases in which the witness' psychiatric experiences are sought to be inquired into by way of an attack on the witness' credibility." Id. "The rationale for such a restriction, as applied in the psychiatric area, is that many psychiatric problems or fixations which a witness may have had are without any relevancy to the witness' credibility, concerned as it is with whether the witness' mental impairment is related to his capacity to observe the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime." Id.

Accordingly, it is incumbent upon defendant to demonstrate "a witness' mental impairment . . . must have been [1] at a time probatively related to the time period about which [s]he [is] attempting to testify," and must [2] "go to the witness' qualification to testify and ability to recall," and [3] "must not introduce into the case a collateral issue which would confuse the jury and which would necessitate allowing the Government to introduce testimony explaining the matter." Id. at 46.

Here, the mental health treatment information sought regarding depression and alleged suicidal thoughts is not relevant under the foregoing standards. It does not tend to show the alleged victim could not remember correctly the events at the time of the charged assault, and it does not show that she had a particular mental incapacity at the time of the charged assault. It would tend to introduce confusing and tangential inquiries into the mental health and emotional life of a child, and it would open a host of collateral issues in allowing the government to introduce yet further information in rebuttal.

In addition, and in the alternative, defendant has not demonstrated that any information pulled from therapists' notes would be admissible. The Supreme Court has held that "a privilege protecting confidential communications between a psychotherapist and her patient promotes sufficiently important interests to outweigh the need for probative evidence." Jaffee, 518 U.S. at 9–10. "[C]onfidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." Id. at 15. Here, defendant has not demonstrated an applicable exception or waiver of this rule in the instant case, which would enable disclosure of therapists' notes, if any, even if only for an camera review. See, e.g., Kinder v. White, 609 F. App'x 126, 131 (4th Cir. 2015) (holding that "district court's preliminary order directing production of [mental health] records for in camera review" under Rule 17(c), to weigh its relevance against confidentiality interests, "was in error" based upon Jaffee).[10]

In sum, for the foregoing reasons, the court affirms that part of the decision of the magistrate judge denying defendant's motion to subpoena mental health records of the alleged victim, including therapists' notes.

### b. Communications about Lying or Sexual Activity

Next, with respect to communications about the alleged victim lying, or about sexual activity, defendant likewise has not demonstrated admissibility. In general, evidence of a witness's "character for truthfulness" may be admissible, but with significant limitations. Fed. R. Evid. 608(a) A witness's credibility may be attacked by testimony about the witness's "reputation for having a character for . . . untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a). However, evidence of "specific instances of a witness's conduct"

---

[10]     Defendant's request for subpoenas for mental health records or therapists notes also fails due to lack of specificity, where defendant does not identify a therapist who would be the target of a subpoena.

in order to attack the witness's character for truthfulness is not admissible. Fed. R. Evid. 608(b). Only in limited circumstances, the "court may, on cross examination," allow such specific instances "to be inquired into if they are probative of the character for . . . untruthfulness" of the witness or a character witness. Fed. R. Evid. 608(b).

Rule 608 is worded "to ensure that it would be restrictively interpreted by district courts." United States v. Piche, 981 F.2d 706, 714 (4th Cir. 1992). In considering admissibility of specific instances of a witness's conduct, the court may consider if a witness previously "affirmatively lied," and there is "no requirement to admit evidence that [a] witness lied before to show that [s]he may therefore have lied at trial." Id. (citation omitted). "[M]ere accusations, rather than findings, of [prior] misconduct based on untruthfulness . . . inherently have little probative value." United States v. Harris, 551 F. App'x 699, 706 (4th Cir. 2014). If "unproven and unconnected to the instant case. . . they naturally pose a risk of misleading the jury." Id.; cf. United States v. Leake, 642 F.2d 715, 719 (4th Cir. 1981) (holding district court erred in not allowing cross examination into a witness's "pattern of fraudulent activity" including indictment for obtaining money under false pretenses).

Furthermore, Rule 412 imposes additional limitations on admissibility of evidence about the victim of a sex offense, as here. Under Rule 412, "evidence offered to prove that a victim engaged in other sexual behavior," or "to prove a victim's sexual predisposition," is not admissible. Fed. R. Evid. 412(a). There are limited exceptions, which defendant does not provide any indication of being able to meet, for evidence that "someone other than the defendant was the source of the semen, injury, or other physical evidence," or other consensual relations with defendant. Fed. R. Evid. 412(b).

Here, defendant has not demonstrated a basis for issuance of a subpoena for communications about the alleged victim lying, or about her sexual activity. The references in investigative materials cited in defendant's supplemental brief are too vague to demonstrate affirmatively a prior instance of the alleged victim lying. See, e.g., Def's Br. (DE 46) at 3 ("she'd been, you know, lying to her mother"; "there's the chance that she's lying"; "A.G.'s mother told investigators that A.B. had lied to her about A.B. and her boyfriend being sexually active"; "It's also how she says things when she doesn't wanna tell you the truth."). In addition, some of these including references to sexual activity are doubly problematic in light of the limits of Rule 412, and their prejudice under Rule 403. Moreover, defendant does not articulate in his supplemental brief to whom a subpoena would be directed for such information, or what it would request. Thus, defendant does not meet the requirements for obtaining this category of information through a subpoena.

In sum, defendant has not demonstrated a basis for obtaining, through subpoena or otherwise, mental health records about the alleged victim, or for other communications about the alleged victim lying or her sexual activity.

B.      iPad Tablet

In contrast with the foregoing, the iPad tablet, which was used by the alleged victim for communications shortly after the time of the alleged offense, properly is subject to production for further forensic analysis.

With respect to communications made by the alleged victim using the iPad tablet, during the limited time period between November 25, 2019, and December 17, 2019, defendant has met the requirements for issuance of a subpoena. Defendant has identified with specificity communications made on the iPad tablet, and he demonstrated that there is at least a "sufficient

likelihood" that it contains communications and information "relevant to the offenses charged in the indictment." <u>Nixon</u>, 418 U.S. at 700.

In particular, excerpts of interviews with investigators demonstrate that the alleged victim communicated with others using the iPad tablet, including about offense conduct, during the time period between November 25, 2019, and December 17, 2019. For example, the following excerpts show statements made by one or both parents of the alleged victim:

- "I kept goin' down, and tryin' to get her to come upstairs to have supper, and she was on – she was, I don't know, <u>texting or Facetiming with friends like that whole time</u>." (DE 46-1 at 5).[11]

- "I don't really text a lot . . . and so I didn't respond to this, but I do – I know that <u>she texted me</u> at – at about 8:10, 'Go up – go upstairs,' and – and asked me to come down, but I didn't see it, and . . . by the time I did come down and she was . . . no longer, uh, <u>Facetiming with her . . . friends . . . and her boyfriend</u>. Um, so that would have been around 8:30. (DE 46-1 at 6).

- "And when she text – <u>she did text me</u>, and again, we don't carry <u>our phones</u> . . . all the time, so we're not looking." (<u>Id.</u>).

- ". . . . [T]hey were doin' this secretive – like, <u>she'd be textin' him</u>, and then as soon I'd come over, she'd <u>close the window</u>. And like I said, the other day, <u>we have the phone hooked up</u>. So I just would go up into the bathroom and pretend I was usin' them and <u>watch them text and see what they were sayin</u>. . . ." (<u>Id.</u> at 12).

- " . . . . I said, 'Do you have any texts that are saved somewhere?' Cause I said, '<u>The police may take **your iPad** and look . . . at conversations that you had with **your friends** after this happened </u>so just show me if there's anything, right?' <u>That's when the thing on steam came – the nine screenshots that I sent you all</u>." (<u>Id.</u> at 16-17).

- " . . . . I asked if there was anybody <u>she had texted that we could have the copies of those things</u>. And <u>she told me about Steam which she had deleted from **her iPad**</u> – the Steam app." (<u>Id.</u> at 19).

The investigator also made several key statements about obtaining information from the iPad tablet:

---

[11]    In all citations to discovery materials with emphasis in underlining and bold, emphasis has been added by the court for purposes of the instant analysis.

- "[W]ould you guys have an objection to us basically <u>searching **her iPad** through electronic stuff – software</u>? It's not gonna take anything off the iPad as far as what you guys can see but <u>99 percent of the time we can pull stuff off there that's been deleted – conversations, text messages, stuff like that</u>." (<u>Id.</u> at 19).

- "[B]ut basically what I would do is if you consented to it or I got a search warrant is <u>I would take the iPad and I would send it to our – our electronic forensics guy . . . . And so we use a couple of different . . . software technologies. One is Cellebrite. The other one is GrayKey. . . . GrayKey is the software that they use to get into the California Active Shooters stuff that Apple would not unlock for 'em.</u> So anyway so once they get into it, they – that's all they do is – is they – <u>it downloads all the information, makes a copy of all the information inside of the – the device and copies it into the program and then it creates reports of everything that's done on that – that iPad. So search histories, uh, if – if they have, uh, iPad calling all those.</u> . . ." (<u>Id.</u> at 20).

- "<u>I think that there's a good chance that it will come up and that's somethin' that they're gonna want . . to look at as far as any other conversations she may have had that – that we don't know about.</u>" (<u>Id.</u> at 20-21).

- "[O]nce . . . everything is downloaded off of it, then it tells evidence so then the trial – once the trial or the whole case is done with, it's returned to you." (<u>Id.</u> at 21).

- "[O]nce that information is taken off of there, <u>it's put into a report and I'm able to view that within the scope that we come up with, you know, for a time period</u>. Um, and that's the information I'm able to view. Um, <u>everything else is actually – gets taken off of it but I don't get to look at it</u>." (<u>Id.</u> at 22).

In addition to the foregoing excerpts of investigator interviews, the government produced in discovery screenshots of what are purported to be "Steam" chats. (<u>See</u> DE 46-2). These screenshots include a reference at the top of each to "iPad," and a time, ranging from "12:33 PM" to "12:37 PM," as well as a reference at the bottom of each to "Steam Chat." (<u>Id.</u> at 1-9). Then, there is a message under a date and time indication stating "Nov 25, 2019, 7:43 PM" and another stating "Nov. 25, 2019, 9:31 PM." (<u>Id.</u> at 9).

Taken together, this information produced in discovery raises multiple issues regarding the alleged victim's use of the iPad tablet for communications in the time period immediately following the alleged offenses, from November 25, 2019, to December 17, 2019. As an initial matter, the court addresses a suggestion made by the government at hearing on April 16, 2021, in

referring to the iPad as being possessed and used by the alleged victim's mother. Based on the foregoing emphasized interview excerpts, at least as pertains to the period from November 25, 2019, to December 17, 2019, there is evidence in the record to suggest that the iPad tablet was treated by the alleged victim and her family as being "her iPad." (DE 46-1 at 19). The alleged victim's parent references a conversation had with the alleged victim where it is expressly referenced as "your iPad" used to communicate with "your friends." (DE 46-1 at 16-17). The court notes this point for clarification of the context of the use of the iPad tablet. At this point, the court does not make findings as to the ownership or use of the iPad tablet by the parents of the alleged victim outside of the time period at issue, including at present.

Considering this context, along with the interview excerpts and the screenshots, there is a likelihood that there is information contained on the iPad tablet that has not previously been produced about communications made by the alleged victim during the time period from November 25, 2019, to December 17, 2019. In particular, the interview excerpts state that the alleged victim used the iPad tablet during that time period for "texts" with her friends and her family, which texts in some instances a parent was able to see from his or her own cell phone (thus suggesting they were not sent via Steam). (DE 46-1 at 5, 6, 12, 16-17). The interview excerpts also suggest that this activity was frequent. (See id.). In addition to this activity, the screenshots demonstrate that the alleged victim used the iPad tablet to send messages via the "Steam" application. (DE 46-2). There is, however, an apparent gap in the communications revealed in the last two pages of the screenshots, where the alleged victim states: "I still need to talk to you later" and "I'll text you tonight." (DE 42-2 at 8). There is then one long descriptive message with the time stamp "Nov 25, 2019, 7:43 PM," but context suggests there were additional communications via "text" on the iPad. (DE 42-2 at 9).

In addition, there is an issue raised with respect to deletion of information on the iPad tablet, as well as the process by which the purported screenshots, themselves, were created and produced. The interview excerpts suggest that the mother asked her daughter if "there was anybody she had texted that we could have the copies of those things," and her daughter referenced "Steam which she had deleted from her iPad." (DE 46-1 at 19). The mother also states that, after asking her daughter about texts on her daughter's iPad, "[t]hat's when the thing on steam came – the nine screenshots that I sent you all," referencing investigators. (Id. at 16-17). There is an incongruity, however, in timing as part of this explanation. In particular, it is not clear how the alleged victim could have deleted the Steam application from her iPad, while at the same time or later the parent was able to take the nine screenshots. There is a demonstrated need to understand in more detail the timing of deletions and screenshots taken from the iPad tablet, as part of any forensic analysis thereof.

A further key circumstance raised by the interview excerpts is the fact that investigators contemporaneously recognized a need for obtaining custody of the iPad tablet, searching it, and conducting a forensic analysis of it. (DE 46-1 at 19-21). The fact that investigators recognized this need at the time reinforces its importance to charged offenses. In addition, the description by the investigator of methods of extracting data from the iPad tablet, including the ability to produce a report of deleted data for a limited time period, further demonstrates that there are reasonably available tools and protocols for doing so.

In sum, all of the foregoing facts and circumstances "permit a rational inference that at least part of the [information sought] relate[s] to the offenses charged in the indictment." Nixon, 418 U.S. at 700. It is also reasonable to infer that additional communications or information about communications on the iPad, if any are located, will be admissible at trial. Such communications

could reveal if the alleged victim made any inconsistent statements after the incident in question. See Fed. R. Evid. 613; see, e.g., Ayala, 601 F.3d at 273 (in case involving rape victims, noting "[t]he record shows, . . . the court permitted [defendant's] counsel to question the [victims] at quite some length on discrepancies between statements they gave to police and to medical examiners"). Forensic analysis of the iPad tablet thus is part of "a good faith effort . . . to obtain evidence," pursuant to the authority of Rule 17. In re Martin Marietta Corp., 856 F.2d 619, 622 (4th Cir. 1988).

Despite this showing of specificity, relevance, and admissibility, the government now objects to copying and searching the iPad tablet, on the basis that it would "set a troubling precedent under Fourth Amendment law and settled principles governing criminal discovery." (Gov. Resp. (DE 55) at 3). In addressing the government's response and motion for reconsideration, the court recognizes that it did not previously articulate its basis for allowing a process to go forward to obtain the iPad tablet and to analyze its contents, where at hearing the court sought to obtain the government's cooperation without coercive measures to obtain the same. The court had presumed erroneously that the government would be willing to proceed forward in a cooperative matter to prepare for a forensic analysis of the iPad tablet. In this respect, the government's motion for reconsideration is well founded. Where the government now resists further investigation of the iPad tablet, the court sets aside its oral order made at hearing on April 21, 2021, directing the government to file a proposed plan for forensic analysis.

Because the court nonetheless has determined that defendant has justified his request for a subpoena for the iPad tablet, the court addresses as follows a number of issues raised by the government in its response, as further grounds for its decision. Thereafter, the court sets forth on its own initiative a multiple-step process for production and analysis of the iPad tablet.

The government argues that "settled law governing criminal discovery limits the government's obligations to items within its possession, custody, or control." (Id. at 6). It notes it has no obligation to investigate and obtain evidence for the defendant, under well-established law of criminal discovery. (Id. at 6-7). The court is in accord with these statements of the law, as previously discussed by the court in the first section of the court's analysis herein. The court's present treatment of the iPad tablet is grounded not in Rule 16 discovery obligations but rather in the court's subpoena authority under Rule 17. Where defendant's request for information from the iPad tablet meets the "three hurdles" of relevancy, admissibility, and specificity, under Rule 17, Nixon, 418 U.S. at 700, the court need not direct the government to take any action in accordance with Rule 16.

The government also argues that it has not already sought to extract, copy, and review the iPad tablet because it "does not wish to pry into the victim's mother's personal digital information, none of which appears connected to this case." (Id. at 6). This argument misses the key features of the process discussed at the April 16, 2021, hearing. Neither the court nor any of the parties heretofore has suggested any plan to "pry into the victim's mother's personal digital information." Much to the contrary, the court and the parties discussed a plan for developing procedures and protocols for evaluating the iPad tablet "that assures the court that the mother's confidences are being protected." Furthermore, this argument misses the nuance in the evidence regarding use of the iPad by the alleged victim, as "her iPad," during the limited time period from November 25, 2019, to December 17, 2019. This highlights the need for an approach that limits analysis of the iPad by time period and by categories of information.

As further support for this approach, the government's response confirms that "Cellebrite software reads and organizes the data so that users can review the device's contents in an organized

way." (Gov. Resp. (DE 55) at 3-4). Such abilities also are suggested in the interview excerpts, specifically that the software "downloads all the information, makes a copy of all the information inside of the – the device and copies it into the program and then it <u>creates reports of everything that's done</u> on that – that iPad." (DE 46-1 at 20). "[O]nce that information is taken off of there, it's put into a report and I'm able to view that <u>within the scope that we come up with, you know, for a time period</u>." (<u>Id.</u> at 22). In other words, based on information in the record about the capabilities of Cellebrite, it is feasible to produce a report that will show information limited to the specific critical time period between November 25, 2019, and December 17, 2019.

The government also expresses concern that a search may not turn up any relevant information at all. In its initial response, the government reported that agent Carpenter "advised that, even if he extracts the iPad, he cannot guarantee he will obtain messages from the Steam Chat app." (Resp. at 55). At the same time, however, the government stated that agent Carpenter "is not specifically familiar with how Steam Chat operates." (<u>Id.</u>). The government now has updated this information in its supplement to its response, stating that Cellebrite "would not produce any content from within the Steam Chat application," and that another software tool, Magnet Axiom, is "unable to decode content from the Steam Chat application." (DE 57 at 1-2).

These concerns are beside the point, however, where defendant has already demonstrated to the court, through the interview excerpts and screenshots, a sufficient likelihood that additional information about communications of the alleged victim, apart from messages from the Steam application, will be obtained from the iPad. The court accepts for purposes of the instant analysis that a forensic analysis of the iPad will not produce content from within the Steam application. This does not foreclose, however, the reasonable likelihood that other information can be obtained from the iPad about any other communications on it between November 25, 2019, and December

17, 2019.[12]  Of course, there is always a possibility that no further information will be found, but then at least the court and the parties can move forward with the certainty of so knowing, rather than relying solely on the government's argument.

The government contends that it "has not sought a search warrant for the device because the government has already obtained a copy of everything it knows exists on the iPad."  (Gov. Resp. (DE 55) at 6).  This is a troubling contention in two respects.  First, as noted previously, government investigators themselves expressed the need to obtain a search warrant for the device, reflecting a reasonable assessment of the circumstances that a search of the iPad tablet could reveal relevant communications not previously discovered. Indeed, recent caselaw suggests that a "forensic analysis" of such a key electronic device used by a victim reasonably would be expected. United States v. Johnson, _____ F.3d. _____, 2021 WL 1703605, at *7 (4th Cir. 2021) (noting an "investigator requested and obtained a consent to search [one victim's] cell phone from [the victim's] father, and the Government then performed a forensic analysis of the cell phone").

Second, the government suggests by the context of its argument that the Steam chat screenshots satisfied the government that those comprise all the relevant information that could be obtained from the iPad tablet.  On the present record, however, this assumption is problematic because of interview excerpts indicating that the alleged victim engaged in text communications with a parent on the iPad tablet outside of the Steam chat application.  There is also no indication as to why the government has confidence in the parent's ability to take screenshots of all the

---

[12]      The government states in its response that "[o]rdinarily, to recover communications made on social media apps, it directs search warrants to the social media companies, in this case Valve, which owns Steam Chat."  (Gov. Resp. (DE 55) at 6 n. 2). The government thus suggests an alternative avenue for defendant to obtain information about Steam chats involving the alleged victim.  Defendant has not himself requested, with the specificity required by Rule 17, a subpoena directed to Valve.  Defendant only sought in his original motion an order directing the government to obtain social media information related to the victim.  (See DE 28 at 4-5).  Defendant states that he did not seek a subpoena for "evidence maintained by a social media website" because the court "may find" that any evidence maintained by such website is "private."  (Id. at 4).  Absent a request for the same by defendant, the court does not address further in this order the propriety of a subpoena directed to Valve.

relevant communications from the Steam chat application, under the circumstances, or if there were other communications that may previously have been deleted.

In sum, there is a demonstrated need for a carefully planned and circumscribed search and analysis of the iPad tablet. Accordingly, the court finds good cause to set aside that portion of the magistrate judge's order denying defendant's motions, insofar as defendant seeks issuance of a subpoena pertaining to the iPad tablet. With that portion set aside, there is remaining for decision an issue regarding the mechanism for issuance of a subpoena for the iPad tablet and for procedures for conducting a forensic analysis of the same, which the court addresses in the next section of this order.

C.     Subpoena Terms and Procedures

As noted previously, "a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order." Fed. R. Crim. P. 17(c)(3). "Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object." Id.

Here, at present, the government reports that special agent Kennedy "took custody of the iPad" on April 19, 2021, and then mailed it to agent Carpenter. Accordingly, the proper recipient of a subpoena for the information contained within the iPad tablet is an agent of the government, not a third party. For purposes of the instant analysis, however, the court takes into account that the iPad tablet was, previously, in possession of the victim's mother, and that the information contained within the iPad tablet subject of any search will be personal and confidential information about the alleged victim in this case.

Because of the potential need for special treatment of personal or confidential information about the alleged victim, and to protect the privacy interests of the alleged victim's parents regarding any information on the iPad tablet not relevant to the instant offenses, the court orders the following multi-stage process of production, including steps for planning a forensic analysis, and procedures for camera review and treatment as authorized. See, e.g., Nixon, 418 U.S. at 714-15 (allowing in camera review of materials requested by subpoena duces tecum to determine the materials' admissibility and relevance).

Although the court no longer presumes the government will cooperate in any of the following steps, the court nonetheless will seek input from the government and defendant, as well as allow opportunity for the alleged victim and her parents to object, in accordance with Rule 17(c). In particular, the court orders as follows:

1.      Defendant's request for an order issuing a subpoena for information contained within the iPad tablet is ALLOWED.

2.      The government is hereby ORDERED to produce the iPad tablet for a forensic analysis in accordance with the following terms and conditions.

3.      The first step for production of the iPad tablet is determining an individual designated to perform the forensic analysis (the "designated individual"). The court DIRECTS the parties to confer, and to file within seven days of the date of this order, a joint status report, if there is agreement, or individual status reports, if there is no agreement, setting forth proposal(s) for the identity of the designated individual. The proposed designated individual(s) shall be either 1) agent Carpenter, 2) an individual qualified to be appointed as a special master, or 3) an individual qualified to be appointed as a neutral court appointed expert pursuant to Federal Rule of Evidence 706. If there is agreement, the parties shall file a proposed consent order regarding the same. If

there is no agreement, the court will enter such further order as is warranted for appointment of the designated individual.

4.      In the second phase of production, within three days of entry of the court's order appointing the designated individual, the government shall deliver the iPad tablet to the designated individual for forensic analysis.

5.      In the third phase of production, the designated individual shall use technology developed by Cellebrite, or other comparable technology, as described in the government's response, "to extract and copy digital data" from the iPad tablet for purposes of conducting a forensic analysis. (Gov. Resp. (DE 55) at 3).

6.      In the fourth phase of production, the designated individual shall use software by Cellebrite, or other comparable technology, to "review the device's contents in an organized way," (id. at 4), and apply date-limiting criteria to identify only information related to the time period between November 25, 2019, to December 17, 2019 (hereinafter "date limited information").

7.      In a fifth phase of production, the designated individual shall further review the date limited information to identify information comprising texts, chats, messages, emails, call data, or other communications data as well as information regarding any deletions or screenshots made (hereinafter, collectively, "relevant information").

8.      In a sixth phase of production, the designated individual shall prepare a forensic analysis report that specifies whether any date limited information and relevant information was located, along with a general description of such information (hereinafter, the "forensic analysis report").

9.      In a seventh phase of production, the designated individual shall provide to the court in camera and under seal the forensic analysis report.

10.     In an eighth phase of production, the court will enter such further order as is warranted regarding the production in camera of any relevant information.

11.     The court also DIRECTS the government to serve a copy of this order on the parents of the alleged victim to allow them opportunity move to quash or modify the subpoena or otherwise object.  Any such motion or objection shall be filed, or lodged on the docket in the form of a notice by the government, within seven days of the date of this order.

## CONCLUSION

Based on the foregoing, the court AFFIRMS IN PART the decision of the magistrate judge as it relates to that part of defendant's requests seeking mental health records and other related information about the alleged victim.  The court SETS ASIDE IN PART the decision of the magistrate judge as it relates to that part of defendant's requests seeking a subpoena for information contained within the iPad tablet. The court GRANTS IN PART the government's motion for reconsideration, and the court SETS ASIDE that part of the court's April 16, 2021, oral order directing the government to search the contents of the iPad tablet.  In its place, the court GRANTS defendant's request for issuance of a subpoena for information contained within the iPad tablet, and ORDERS a forensic analysis of the iPad tablet in accordance with the conditions set forth herein. The court DIRECTS the parties to confer and file status report(s) within seven days of the date of this order, as detailed herein.  The court also DIRECTS the government to serve a copy of this order on the parents of the alleged victim, as set forth herein.

SO ORDERED, this the 11th day of May, 2021.


_____
LOUISE W. FLANAGAN
United States District Judge

29